Good morning, Your Honors. May it please the Court, Thomas Brackey and Jonathan Freund here on behalf of Appellants Today, Bob Daisley and Lee Kersley. It seems to me, based on the briefs, that there are two fundamental areas of inquiry before us today. One set of issues concerns accounts, their nature and whether they're open, and the other set of issues relates to unfair competition, particularly the Lanham Act and the Daystar case to which the Court gave us special direction. I want to talk about the account issues first, if I could. In order to look at them, you need to apprehend the basic facts of the situation. You need to recall that in early 1980, the four musicians got together and recorded these albums, which are now, to the extent anyone's interested, really part of music history. They're big albums. They're important. They're well known. That's relevant because the sales of these albums continue to this very day. When the four... I mean, there are a lot of problems with it, but the, you know, that issue, at least up through 1986, was resolved by settlement of the precise claim that you're making now. Correct, Your Honor. Then, after that, you go to Sharon and say, where are our royalties? And she says, you aren't going to get any. You're not entitled to them. We're keeping them out of here. And you go in, I think, 1991 to Colin Newman with the same query with the same response. So, even though it is true that the albums still keep selling, why, if you believed, or why did your clients believe they were entitled to royalties, did they not sue within the time period allowed from 1981 at the latest? Well, I think the question, with all due respect, is not so much why didn't they sue at that time. The question is, did they have a legal entitlement to sue on a cognizable legal theory as of 1998? And I think there are a variety of reasons why they didn't sue, but I don't think they are directly germane to the issue of whether the account remains open. If the court is inclined to consider that the account was open and that royalties were paid and that sales were paid. Well, you know, there's no question that royalties probably were paid to somebody, although I don't know that. I just assume that there were some kind of royalties being paid, probably, to Ozzie. But there's no obligation, it's clear, to pay royalties between your clients and anybody. I mean, there's not an account between your clients and anyone. I can't go and say, aha, there's the account. It's a book and it's got pages in it, and I can look at it and I can see records sold, royalty paid, records sold, royalty paid, records sold, stops. Then you come in and say, ah, there was an account stated, and the last entry on there was on such and such a day where you recorded records sold, but you didn't pay me. Well, let me break those issues down just a little bit if I could. First of all, with respect to the issue of there being a book, I know there's been quite a bit of briefing on that subject. Our position is, under Carter v. Canty, we don't need a book. We have a mutual open and current account. Second of all, even in the face of a statement by Sharon Osborne, I'm not paying you one more red cent. Why shouldn't we view that statement as a refusal to open an account, to create the book? Well, remember when the statement occurs. The statement occurs in the late 80s, early 90s, quite a number of years after the work has been performed and after the sales have been occurring. That's point one. But they don't get any money after 1986 from the Osbornes, do they? Well, they get money twice a year in the form of record royalties and, of course, from the Performing Rights Society. Correct. Correct. Publishing royalties. Excuse me. It is different, and I misspoke. Excuse me. They didn't receive any record royalties after 1986. That's correct. But let's focus in on Sharon Osborne's repudiation. Our argument, and I hope it's persuasive, is that repudiation is not a defense to an account action. It's a contract defense. I'm talking about a defense. I'm talking about what triggers the running of the statute of limitations and either drawing up of the royalty payments, which you thought you should have gotten, or a refusal to pay them, either one, should show either that it's not open or that if it was open, it was closed, thereby triggering the period of time within which to sue. I understand the question, I believe. Our position is that the account remains open to this day and that a simple statement of Sharon Osborne, who is not a party to the account or to the relationship which gave rise to the account, cannot act to close the account. In order to close an account, you need to look to the nature of the commercial relationship. You're talking about closing the account. You haven't convinced me that one was ever open. That's the problem I'm having. Well, let me go back and see if I can address that issue first. Was an account ever opened? We know that we don't need to have a written book per se. We know that the question of whether an account is open or not open is a fundamental, factual issue, often inappropriate for disposition on summary judgment. We look to Code of Civil Procedures Section 334A that talks about accrual on a cause of action for open account. And what does it say? It says the cause of action is deemed to have accrued from the time of the last item proved in the account on either side. Mercantile versus Doe supports that. So we can look to the relationship between the parties to determine whether or not an account is open. In this case, we don't even need to do that because we can go to the stricter requirements of a book account and we can see that there is evidence the account was open. We have ledgers which we've produced in evidence which show that royalties were paid and advances were paid against royalties and there were recoupment of costs. Those ledgers are there. The entries in those stop after 1981. That is true. But we don't believe that the mere failure to make entries in the account acts to close the account. Again, we're still on the subject. It never closed. It closes when commercial transactions cease. So your argument would be that the statute doesn't begin to run until these albums stop selling. Correct. Not the fact that these royalties as to your clients dried up some time ago. As long as our clients have an entitlement to royalties which is set forth in the 1980 recording agreement, that as long as the commercial transactions continue, the account remains open. It's not closed because there's no good faith striking of a balance. Repudiation, I'm not going to pay you, isn't the good faith striking of a balance. It doesn't convert to an account stated. As long as credit continues to be extended, as long as our clients allow for their joint works of authorship to be exploited, sales continue to occur, entries continue to be made, and they continue to be entitled to receive royalties. You look at the 1980 agreement and it says specifically in there that the lender, which was Mr. Osborne's company, hereby irrevocably authorizes and requests JET, that's the record company, to deduct from each of the royalty rates specified in paragraph 7-2 a rate of 4.5 percent. Your clients were not a party. Correct. They were not a party to that, but this document does make reference to them. And we're not saying they're a party to the contract. Well, are you saying they're a third-party beneficiary of it? We're not making a contract claim. We're looking at the course of dealing under account law to determine whether or not accounts have been opened. And if so, what are the terms of that account? And this document, together with the July 1, 1983 agreement, form, we believe, the basis for our entitlement. There's no question that our clients were informed, do this work and you'll receive royalties. There's no question that recording agreements were drafted between them. And that our clients acted with the understanding that they were going to receive royalties. There's also no question that they never signed their rights away and that they were never paid. The question remains, what is their entitlement? What is the nature of this relationship? Did they simply give up all of their rights by not signing a recording agreement? No. Copyright law, both here and in the UK, is clear. They remain joint authors. You know what, you don't have a copyright claim. We don't. You don't have a joint authorship claim here. You've got an account stated claim. I mean, an open account claim. An open account claim, correct. And what we have to do is say, was there an account created, did it open? If there was an account created, and we contend there was for the reasons we've talked about, when did it close? What causes it to close? Is it Sharon Osborne saying, I'm not giving you any more money? The case law simply doesn't support that. The case law looks to the nature of the relationship. As long as sales continue, the defendants continue to make money off of our client's product and to keep the money which was promised to our clients. And as a footnote to that issue, I would add, remember, these are intense factual issues. We all have a lot of questions about what was the nature of the relationship? What contract happened here? What was the course of dealing? What payments occurred? Who said what to whom? And I would submit that there is at a minimum tribal issues of fact here regarding. You've got to get to a prima facie showing. And the problem we're having is, on this record, we don't see it. You can't give us a contract with your client's signatures on it. We haven't seen anything that purports to be an account. Well, I would direct the Court's attention to the ledger sheets, which we've submitted, which were the basis, at least in part, of the summary judgment motions, and which contain entries for both Mr. Daisley and Mr. Pritchett. They had some expenses. I mean, so they bought some food on the trip. And so they got an advance. There's nothing on those ledgers that says, X number of records sold, X percent royalties paid. X number of records sold, X percent royalties paid. That's correct. It's not specific in that regard. But if you look to the correspondence from counsel for defendants to counsel for the plaintiffs, while they're spending 18 months negotiating our client's recording agreements, you see, and this is in the record too, that here is your recording agreement in final execution form. The only thing left to insert is the percentage for your record royalties, which we have already discussed and which we have agreed, and which, of course, is in the 1980 contract, which you've already seen, which carves out your 4.5 percent. So the idea that our clients simply were completely naive, which they weren't. They were experienced musicians and had counsel. The idea that they went and performed on these records and did this work with the expectation they were going to get nothing is difficult for me to accept. And I think that there is evidence in the record which should be considered, which creates a tribal issue of fact, that there was a reasonable expectation on the part of our clients that they were going to receive payment for their work. Now, what the exact nature of that was, we can't say. We have our belief. The other side has their belief. But it's a tribal issue of fact. But why didn't they bring the claim earlier? I'm still bothered by their delay in asserting their claim. Ultimately, I don't know why they didn't bring their claim earlier. There's been a variety of reasons that have been touted ranging from – I don't know. Let me move on, if I can, in the time I have left, to talk about the unfair competition claims, unless the Court has any further specific questions on the account issues. Okay. I think the most important thing to talk about in terms of the Lanham Act claims, as they've been advanced, is are they still applicable in the light of DASTAR or DASTAR? It's a tricky issue. The first readings of DASTAR that I made, I had some trouble understanding exactly what Justice Scalia was proposing to do. But looking at it more closely, I think that our Lanham Act claims do survive. And let me just insert here so I don't forget later. Remember, our unfair competition claims took two forms. We had our 43A Lanham Act claims, but we also had our state business and professions code claims. And I don't believe that DASTAR speaks to the state claims. But looking at the federal claims, what does Scalia say is the issue? In this case, we are asked to decide whether Section 43A of the Lanham Act prevents the unaccredited copying of a work, and if so, whether a court may double a profit award to deter future infringing conduct. That's the issue. What's the holding? The holding is 43A of the Lanham Act does not prevent the unaccredited copying of an uncopyrighted work. Looking at the case narrowly, which I think is appropriate in this case for reasons I'll get onto later, we have a holding that doesn't apply strictly to our situation. We are not seeking to extend the scope of the Copyright Act, either in terms of substance or in terms of chronology. We have copyrighted works that are at the basis of these claims. The copyrights in this music, these solo compositions and performances still exist, and we are not trying to talk about the... What are you talking about? I'm talking about that... What copyrights are you talking about? They're copyrights in the composition. We don't have any copyrights. Correct. Okay. I'm sure somebody else does. That's true.  It's not an issue in this case. It is an issue. Correct. All right. Let me get back to Dasdor, if I could. Excuse me. The reasons for Dasdor, as cited in the opinion, there are a number of problems which arise, according to Justice Scalia. He's afraid that if the producers of goods are identified, in this case it would have to be the performers on records are identified specifically, it would cause a conflict with copyright law. That's the first problem. The second problem he sees is that it would cause an extension, chronologically, of the Copyright Act beyond the period of time in which Congress is authorized to do so. Let's look at the first issue, conflict with copyright law. It's basically a preemption argument. There is no conflict with copyright law because the right of attribution in music is not covered in our Copyright Act. Certainly it's part of Bort Morale. Certainly it's part of Byrne Convention. But in the 1988 Byrne Convention Implementation Act, Congress did not incorporate the rights of attribution and integrity into our law, with the exception of the visual arts right. So we don't have a right which is the subject of copyright. We don't have a preemption issue. Allowing for performers to be properly identified on CDs and records would not cause a conflict with copyright law. Second point, extension of the law chronologically. Justice Scalia places real emphasis on the notion that if, in the facts specific to Daskar, if the producers of the goods were identified, i.e., the persons who were authorized to distribute the goods presently, if it was necessary that they be identified, we would be extending protection for an indefinite period of time beyond which Congress is authorized to do so. I.e., we could bring a trademark claim for improper attribution at any point in time, and that would effectively extend the Copyright Act improperly. In this particular case, while we were still within the copyrighted period, and that's why I brought that up, since these copyrights are still in effect, we don't run a risk of extending the. . . I guess, I mean, just on a sort of more simplistic level, you have a reverse-palming-off theory, right? Yes. Okay. And we have some prior law that says that's okay. And if you don't credit me for something that I did, that's reverse-palming-off. And why doesn't Daskar say, you know, that's just not a viable theory? Because what Daskar says, Daskar intends to interpret 43A. It doesn't attempt to overturn 43A or to change it fundamentally. The problem of which we complain goes directly to the language of the statute in 43A. We are not concerned so much. . . Reverse-palming. Let's look at the statute. The statute says under 43A you cannot use false or misleading descriptions of fact or false or misleading representation of facts which are likely to cause confusion or to deceive as to affiliation, connection, or association with another person. What Daskar is not saying and what would not be is that that part of the statute should be repealed. When you take the performances of Bob and Lee or of Ozzie and you say those performances belong to someone else, you are making a false statement of fact, and it is going to cause consumer confusion. When you look at the Daskar case, people were arguing about the right of attribution for licensees. Who is currently authorized to exploit this video in the marketplace? You took something to which I have rights. You wouldn't even be aware of that as a consumer unless you looked at the tapes, recognized that the contents were similar because the titles are different and they're sold in different places, and then came back and said, wait a second, isn't that really New Line's work? It's fundamentally different when you're talking about musical compositions. If Daskar is interpreted, broadly applied, without limitations, what it's saying is very troubling, is that you don't have to identify who performers are on musical CDs and on records. And if that's the case, that is something, in the words of Justice Scalia, that consumers are very concerned about. That is the sort of harm that the Lanham Act seeks to protect against, and that is the sort of result which would cause confusion and be a real detriment to the public. Unless the Court has any further questions, I'll submit. Thank you, Daniel. Let me appease the Court. Good afternoon. My name is Oren Snyder, and I represent the defendants in this case. I think it's important, Your Honors, to emphasize that this so-called open book account claim is really a concoction that first surfaced in substance in the case only at the close of discovery after the plaintiff was forced to dismiss his copyright claims that he pursued for three-plus years when the evidence showed that those copyright claims were hopelessly time-barred by at least 20 years. And the evidence, which remains undisputed, indeed uncontroverted at all, revealed that the plaintiffs and their associates had offered $100,000 to their star witness to say that Ozzy Osbourne hadn't written the songs on the records. Well, putting those things aside, if I understand it right, at the heart of Daisley's position on the open book account is that all you have to do is look at the royalty records that run from Fiat, Montrose, to Osbourne and give me four and a half or whatever the percent of that. And as long as the records that produce those royalties are in effect, that accounts there and it's easy to figure out, and that's what I'm entitled to. Right. And the last record was just sold, you know, 10 minutes ago. Right. Of course, the problem with that argument is it presupposes an entitlement to record royalties in the first place. It's undisputed that in the 20-plus years since these records were first released, the plaintiffs have not received a dime a cent of record royalties. Indeed, they sued in the United Kingdom because they weren't getting record royalties. So that shows what? That the account was never open? The account was never open. There was no account. As the panel indicated, there's not even a prima facie case. There's no contract. There are no detailed statements as required by the statute. The ledgers they point to are not the kind of reliable evidence of a debt assumed by one party in favor of the others, as Your Honor pointed out. They're random, isolated, handwritten notes largely of personal expenses and certainly not the kind of records that either the statute or the decades of case law requires in order to extend the statute of limitation on oral contracts from two years to four years. And, of course, that's why the California courts are so vigilant in making sure that plaintiffs with time-barred contract claims, here their contract claims which were asserted in the U.K. in the mid-'80s are time-barred by two decades as well. They didn't assert those contract claims in this court because they were so patently and obviously time-barred, they had to find some substitute. They first dressed up the time-barred contract claims as copyright claims. After three years of litigating those, they dismissed those with prejudice. Then they recast them as so-called open book account claims. And the California courts are clear that you cannot shop for causes of action in that way and end up with an open book account claim without meeting those very strict statutory requirements. And the statute is not ambiguous. The statute requires a detailed statement regarding transactions between a debtor and a creditor arising out of a contract or some fiduciary relation and which clearly demonstrates the alleged debits and credits against whom and in favor of whom entries are made and that such records are entered in the regular course of business and kept in a reasonably permanent form and manner. Not a single one of those statutory elements exists here, not even close. I could take them all individually, but I think the record is perfectly clear that there's no agreement. As Your Honor indicated, there's an agreement between other parties. These plaintiffs are not party to any agreement which entitles them to record royalties. There are no detailed statements. They're random personal expense vouchers that date from the late 70s and early 90s. There are no debits and credits regarding record royalties that indicate an ongoing perpetual royalty obligation and certainly nothing kept in the regular course of business. So what the hanger hat on is this notion that because there is a so-called continuing commercial relationship, that is that the records continue to be sold, some of that gives rise to an open book account. But that assumes the whole case. Whether the plaintiff has any legal entitlement in the first instance to royalties is the question, and there is no evidence in this record that that is the case. They never established remotely an entitlement. The only arguable entitlement they had was on a breach of oral contract claim, which they asserted in the United Kingdom and settled and which is time-barred by the mid-1980s. Mr. Snyder, may I assume because of the fact that no party brought the terms of the settlement agreement to our attention that there was no waiver of future claims clause included as we frequently see in settlement agreements? I think the evidence indicated that some of the records from the British court were no longer available, which is why the record was bereft of that document. I understand that, but presumably there are witnesses who could offer declarations that could at least help us establish whether the parties even discussed that subject. Well, Plaintiff Daisley testified at his deposition, and I'm looking for the site, that he understood fully that he could not come to the Osbournes for record royalties following not only the settlement of that case but the entry of a 1986 release that he signed. And he testified at his deposition unequivocally that he understood that he could not come for record royalties after the mid-1980s. Of course, I'm just looking for it right now, Your Honor. I'll find it. If Your Honor permits me, I'll find it during the argument. So not only was there no open book, not only was there no account open, and not only is there no evidence that even remotely satisfies the rigorous statutory requirements for an open book, but clearly, as the district court held, any book account that theoretically existed in the late 70s and early 90s closed upon the last entry. And the case law is clear that the last date of the last supposed entry is the date when the cause of action begins to run. The last entry here that Plaintiff Hangner had on is 1981, so they had until 1985 to sue, and they were 13 years late. And at the latest, as Your Honor pointed out, if there was any doubt at all, the repudiations in this case could not be more express, unequivocal manifestation of an intent by defendant not to pay on an account than exists here. Indeed, the record consists of the plaintiff's own diary entries, and both plaintiffs testified at their depositions that Sharon Osborne, as Your Honor pointed out, said, we get it, we keep it, and that is how it will continue. That was 1991. And the law does not permit a plaintiff to allege an open book account and then argue that once opened, it remains open indefinitely in the face of this kind of express and unequivocal repudiation. The RNC case, upon which both sides rely, makes plain that, quote, a book account does not remain open indefinitely, close quote, that either party may close the account at its, quote, convenience, close quote, and that the open or closed nature of a book account turns not on the account balance per se, but on the party's expectations of possible future transactions between them. In this case, by 1991, appellants could not have had any reasonable expectation or even, frankly, unreasonable expectation of receiving record royalties. They had not received any record royalties for, at that point, more than a decade with respect to the first album and a decade with respect to the second album. And here it is, the 1980s and 90s, in both decades, they're told that the Osbornes are not paying and will never pay record royalties. And any theoretical account that might be able, that might have been cobbled together by drafts and handwritten personal expense ledgers, any such theoretical account certainly closed at the very latest at the time of that repudiation. And to hold otherwise would be, I respectfully submit, to not only rewrite the open book account statute, but to ignore the decades of law interpreting that statute and its predecessor making clear that open book accounts are a business record substitute for a contract and do not remain open indefinitely at the whim of one party or the other but turn on the expectations of the parties. And the undisputed record here is clear that any expectation would be unreasonable as a matter of law after 1991. Unless the court has any other questions on the open book account claim, I'll turn to the Supreme Court's decision, which is, we believe, a fundamentally, represents a fundamental alteration of the way in which federal courts now must view Lanham Act and 43A cases in disputes involving creative works. And the Supreme Court really has established a new framework for 43A reverse passing off claims. And what was interesting about Mr. Brackey's discussion of the case is that while dissecting the rationale, he at no time made reference to the express holding of the case. And I think, as the panel, I think, acknowledged during its question, Mr. Brackey, the Supreme Court's holding is that a false designation of the origin of goods, as those terms are used under 43A in the unfair competition law, refers only to the producer, in this case the manufacturer, of the tangible goods that are offered for sale and not to the author of the idea, the creative participant whose expression is embodied in the idea, or anyone else who played a creative role in the idea. And, of course, for years this Court, leading the way in other courts, have ruled consistently that 43A embraces such claims brought by directors, actors, screenwriters, musicians, and the like, who don't like the credit they received on a creative work. And the Court unanimously, with only Justice Breyer not joining since he was the judge in the – I think his brother was the judge in the Northern District who handled the case, I believe. But certainly the unanimous Court held that the Lanham Act provided – Do you think he didn't join it because of – I think so. I think that was the only reason why. But the unanimous Court held squarely that the Lanham Act now provides no remedy for a plaintiff alleging that a creative work doesn't properly credit that plaintiff for his or her creative contribution to the work because the Court was concerned with the creation of a species of mutant copyright law. So the import of that holding here is that plaintiffs have no Lanham Act claim as a matter of law. If that were correct, does it necessarily follow that the same is true of the California Act? I realize that we have said that they're substantially congruent. Yes, Your Honor. But why would the same rationale necessarily apply? That question is the one that my colleagues and I have been talking about all morning, and I think there's been some commentary on that in California already. Of course, this Court, as Your Honor has pointed out, this Court has held a substantial – that the statutes are substantially congruent. I think the best argument for the application of Dastar or Daystar – we're not sure how you have to pronounce it – the best argument that it applies to a 17-200 unfair competition claim would be a preemption argument, that any contrary interpretation of 17-200 because it would conflict with the Copyright Act may be preempted. Happily, in this case, that the Court, if it doesn't wish to reach that result in this case, has ample grounds to affirm the district court's dismissal of the Lanham Act claim because – The California claim. The California claim, because even pre-Dastar – let's assume there was no Dastar – the district court's decision below, under the jurisprudence of this Court, the pre-Dastar jurisprudence of this Court and the 17-200 jurisprudence of this Court, not only correctly dismissed the Lanham Act and state unfair competition claims, but had no other alternative. Here, in four years and through five complaints, the plaintiffs had every opportunity in the world to tell us what it was about these so-called credits that were problematic. All of that is true. The difficulty is that in your motion for summary judgment, you didn't identify the substantiality of the evidence as a ground, but rather proceeded only on statute of limitations. That's true. I don't think that creates a problem for this Court, respectfully, Your Honor, for two reasons. First, that argument, the failure of notice argument, is waived in this Court as a matter of law. The plaintiffs in the court below moved for reconsideration of the district court's dismissal of the Lanham Act claim, and there was a substantial briefing and a substantial oral argument. The court bent over backwards to give the parties every opportunity to argue, and at no time did the plaintiffs make this notice argument. And as a matter of law, under this Court's clear precedent, they can't resurrect that argument. They can't assert that argument for the first time on appeal. Moreover, the Court did give the plaintiffs notice that it was considering the merits of the credit claim because it asked Mr. Bracken pointedly during oral argument, what is it about these credits that you keep on complaining about? I can't seem to figure it out. There have been four or five pleadings in this case. There have been volumes of evidence, and you're not telling me what is wrong. And to the Court's – as the Court ruled in both decisions, both its original decision dismissing the Lanham Act claim and its reconsideration decision affirming that dismissal, the Court ruled correctly that the plaintiffs still, still have not identified, first, which credits they say are improper, and second, haven't produced a shred of evidence of any such improper credits. And if you look at the briefs on appeal, still on the – still at this very late date, it's a complete mystery. And as to what it is these plaintiffs are complaining about in terms of the credits, there are still vague generalities without any citations to record evidence, which is what the Court found and based its dismissal on. And there is no, for example, indication of what songs or what records are supposedly containing the false credits. And certainly as the district court found no evidence of any such improper credits beyond the phantom court exhibits that the court in her footnote indicated went and looked at and didn't find. And, of course, all we're left with is self-serving declarations, which this Court has held consistently is insufficient to create a triable issue. So if the Court doesn't want to apply DASTAR to the unfair competition claim under California law, the district court's dismissal of that claim for lack of evidence provides ample grounds for affirming that part of the decision. I guess I would also note, Your Honor, that in this case, to the extent the Court is concerned about the notice issue, we did have the benefit of a reconsideration proceeding. So this plaintiff had two bites of the apple, both summary judgment and reconsideration. And this judge truly, district court, bent over backwards to give both sides every opportunity to complete the record and to provide evidence in support of their respective positions. And as the Court held, finally, in its last decision, that plaintiffs had numerous opportunities to detail their improper credit claims, including five amended complaints and a lengthy brief in opposition to the defendant's motion for summary judgment, they failed to do so. The only evidence before the Court was plaintiff's conclusionary statements that they had been improperly credited. Plaintiffs now attempt to salvage their claim by submitting a basis declaration regarding the improper credits. And, of course, that was too late because it was on reconsideration. I respectfully submit that it's time to bring this case to a close and apologize for Court's decision in all respects. Thank you very much. Thank you, Your Honors. In my 36 seconds left, I want to raise just a few points. I'm going to move quickly. With respect to the genesis of the open book account claim, it had been in the pleadings for years before the summary judgment motion. And I believe even before Mr. Snyder became involved in the case. Recall that the facts of this matter are Byzantine. Recall that agreements were concealed. It's only natural that our clients would have brought a claim on a variety of theories initially and later reduced those claims to an account, the claim that they had had from near the inception of the matter. With regard to creating the account, recall a fiduciary relationship can create the account. Our clients had an expectation and a right to receive payment for their work. To the extent that they had that right, the money flowing from the licensing of their joint work of authorship went to defendants. Was this case on fiduciary in lieu of a contract? It is cited in the footnotes in our reply brief. I don't have it in front of me here, but it is in one of the footnotes to our reply brief. Okay. With respect to the consent decree, the 1986 settlement, Justice Talmadge, you asked about whether or not it's forward-looking. We do have a copy of the consent decree. It is specifically not forward-looking. We do have the analysis from our English counsel, which is contained in our reply brief, even though it's sort of tedious, that says that under English law, under race judicata analysis there, it could not possibly apply to future claims. I direct the Court's attention to that. Two more quick points. With regard to whether or not the parties can close an open book account at will simply by repudiation. They cite RNC, and they cite Groom, and they cited a series of other cases in the summary judgment motions. In each of those cases, the only time a repudiation or refusal to pay impacted an account was when it had already become an account stated. In that sense, it's a contract, and the refusal to pay set the clock ticking. If the account's still open, if the transactions are still continuing, if I'm still taking your credit, I can't simply say I'm not going to pay you, and therefore, the account relationship ceases. As long as I get a benefit, the account remains open. I urge the Court in closing to look at Daystar narrowly, apply it to the facts of Daystar and not to the facts here. It's not intended to overturn the plain meaning of the statute. And with that, Your Honor, I would submit. Thank you. Thank you very much. I also appreciate your argument in this case, and the matter just argued will be submitted. Thank you, Your Honor. Court stands adjourned for the day. All rise.
judges: Rymer, Tallman, Leighton